**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA M. LOVELL, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 3:12-CV-0281 |
| | : | |
| vs. | : | (Complaint Filed 2/13/12) |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Caputo) |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Lisa M. Lovell's claim for social security disability insurance benefits and supplemental security income benefits.

On February 5, 2010, Lovell filed protectively[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 11, 73, 75 and 102-116. The applications were initially denied by the Bureau of Disability Determination[2] on April 30, 2010. Tr. 76-85. On May 8, 2010, Lovell requested a hearing before an administrative law judge. Tr. 88-89. After 11 months had passed, a hearing was

---

[1]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2]The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance and supplemental security income benefits on behalf of the Social Security Administration. Tr. 76 and 82.

held on April 14, 2011. Tr. 45-71.  On April 25, 2011, the administrative law judge issued a decision denying Lovell's applications. Tr. 11-24.  On June 23, 2011, Lovell filed a request for review with the Appeals Council and on December 11, 2011, the Appeals Council concluded that there was no basis upon which to grant Lovell's request. Tr. 1-7.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Lovell then filed a complaint in this court on February 13, 2012.  Supporting and opposing briefs were submitted and the appeal[3] became ripe for disposition on July 6, 2012,  when Lovell filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Lovell met the insured status requirements of the Social Security Act through September 30, 2009. Tr. 11, 13, 122 and 168.  In order to establish entitlement to disability insurance benefits Lovell was required to establish that she suffered from a disability[4] on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded

---

[3]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

[4]As will be explained in more detail *infra* a disability is a condition that prevents an individual from engaging in any substantial gainful activity for at least a continuous 12 month period.

by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Lovell  who was born in the United States on January 16, 1978,[5] withdrew from school in 1994 after completing the 10th grade. Tr. 51, 73, 75, 102 and 127.  Although Lovell stated that she attended special education classes, she can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 125, 127 and 163.  Lovell has a driver's license and stated that she drives to her medical appointments and the grocery store. Tr. 51.  At the time of the administrative hearing, Lovell was working on obtaining a General Equivalency Diploma. Id.

Lovell has past relevant employment[6] as a forklift operator which was described by a vocational expert as semi-skilled, medium work; a delivery driver for an automobile parts business also described as semi-skilled, medium work; and as a packager described as unskilled, medium work.[7]  Tr. 68-69.

---

[5]At the time of the administrative hearing and the administrative law judge's decision, Lovell was 33 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c).  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

[6]Past relevant employment in the present case means work performed by Lovell during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

[7]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

(continued...)

Records of the Social Security Administration reveal that Lovell had earnings in the years 1994 and 1997 through 2005. Tr. 117. Lovell's annual earnings ranged from a

---

[7](...continued)

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

low of $325.13 in 1994 to a high of $17,669.01 in 2002. Id. Lovell's total reported earnings were $87,710.73. Id. Lovell's annual earnings only amounted to substantial gainful work activity in the years 1998 through 2002.[8] Id. After 2002 her reported annual earnings were $1898.14 in 2003, $4206.40 in 2004, and $1366.25 in 2005. Id.

Lovell testified at the administrative hearing that she last worked in December, 2005, as a packager, and that her employment terminated because she was laid off because the plant where she worked closed. Tr. 52. However, in documents filed with the Social Security Administration Lovell stated that she stopped working because of her conditions. Tr. 126.

Lovell has made inconsistent statements regarding when she became disabled. As noted above, Lovell contended she stopped working because of her conditions. In the application for supplemental security income benefits Lovell stated that she became disabled on November 4, 2007. Tr. 102. However, Lovell in the application for disability insurance benefits and when she testified at the administrative hearing stated that she became disabled on May 12, 2009. Tr. 50 and 109.

Lovell contends that she is disabled because of both physical and psychiatric problems. Tr. 50. The physical problems alleged are severe spasms and cramping of the

---

[8]A claimant's earnings must rise to a certain level to be considered substantial gainful work activity. "To be eligible for disability benefits, a person must be unable to engage in substantial gainful activity (SGA). A person who is earning more than a certain monthly amount . . . is ordinarily considered to be engaging in substantial gainful activity." Substantial Gainful Activity, Automatic Determinations, Social Security Online, http://www.ssa.gov/oact/COLA/sga.html (Last accessed August 8, 2013). In 1998 the amount for a non-blind individual was $500 per month or $6000 per year; in 1999 and 2000 the amount was $700 per month or $8400 per year; in 2001 the amount was $740 per month or $8880 per year; and in 2002 the amount was $780 per month or $9360 per year. Id.

muscles of both legs, emphysema,[9] shortness of breath, kidney problems, low back pain and fibromyalgia. Tr. 50, 81 and 130. As for the psychiatric impairments, Lovell claims she suffers from anxiety, panic attacks and depression. Id. At the administrative hearing when questioned why she could not return to work focused on her alleged pain and muscle spasms and cramping in her legs; her depression and panic attacks; and her shortness of breath. Tr. 53-55. Lovell stated that the muscle spasms in the legs were very sporadic but that the cramping in the aftermath of the spasms could last for days. Tr. 53.

Lovell testified at the administrative hearing that she resides in a house with her husband and three children, ages 3, 10, and 14. Tr. 50. Lovell testified that she wakes her children for school and changes her 3-year old's diapers and feeds him breakfast. Tr. 57. She straightens up her house "a little bit." Tr. 58. Lovell watches television and uses a computer. Tr. 58. She attends church and some of her children's activities, such as home football games. Tr. 59-60. She denied exercising even though the medical records which will be reviewed infra note otherwise. Tr. 59-60 and 676. Lovell admitted visiting family members "once in a while" but most of time they come to her house. Tr. 60.

Lovell on April 7, 2010, completed an 8-page document entitled "Function Report – Adult" in which she stated that she had no problem with personal care. Tr. 161. Lovell indicated that she prepared simple meals and performed some household chores. Tr. 162. Lovell reported that she goes outside daily and walks and drives a car. Tr. 163. She shops in stores for food. Id. Lovell stated that her hobbies were watching TV and trying to walk. Tr. 164. Lovell goes to church every Sunday. Id. Lovell has no problem getting along

_____

[9]One medical record reveals that Lovell started smoking cigarettes when she was 10 years of age and smoked two to three packs per day for about 19 years. Tr. 179.

with family members, friends and neighbors. Tr. 165. In the "Function Report," Lovell when asked to check items which her "illnesses, injuries, or conditions affect" did <u>not</u> check standing, reaching, sitting, talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands and getting along with others. <u>Id.</u>

For the reasons set forth below we will affirm the decision of the Commissioner denying Lovell's applications for disability insurance benefits and supplemental security income benefits.

## <u>STANDARD OF REVIEW</u>

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. <u>See</u> <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has an

---

[10]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[11] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities,

(continued...)

impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an

---

[11](...continued)
the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

[12]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[13]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of the medical records. The relevant time period for review of the medical records is from May 12, 2009, the alleged disability onset date, to April 25, 2011, the date the administrative law judge issued his decision and our task is to focus on the records before the administrative law judge when assessing whether or not her decision is supported by substantial evidence.

The first such record we encounter is from May 15, 2009. Tr. 347-350. On that date Lovell had an appointment with Karen Peterman, a certified registered nurse practitioner, at which Lovell complained of depression but also indicated that "it is not difficult at all to meet home, work or social obligations." Id. The notes of this appointment by nurse Peterman do not contain any mental status findings only the subjective complaints of Lovell which included having anxiety, fearful thoughts, an irritable mood and poor concentrations. Tr. 347. A physical examination revealed, inter alia, that Lovell's respiratory system was normal to inspection and that her lungs were clear to auscultation. Tr. 348. The clinical assessment by nurse Peterman was that Lovell was suffering from depression and anxiety. Tr. 350. Also, nurse Peterman observed that Lovell's right lobe of her thyroid gland was enlarged and concluded that Lovell suffered from a nontoxic multinodular goiter. Tr. 348 and 350. Nurse Peterman also scheduled Lovell for a nuclear medicine thyroid iodine uptake scan which was completed on June 10, 2009, and revealed a "mild to moderate enlargement of the gland" and a "mildly elevated 24-hour iodine uptake." Tr. 350 and 428.

On June 9, 2009, Lovell appears to have had a psychiatric counseling session

with Douglas R. Reed, M.D., at Family Life Services, Diakon Lutheran Social Ministries, located in Williamsport, Pennsylvania. Tr. 229.  A mental status examination on that date revealed that Lovell was cooperative, had normal speech, her mood evidenced some anxiety, her affect was congruent, and her thought process was linear and goal directed; she had no suicidal or homicidal ideations; she had no auditory or visual hallucinations or delusions; and her cognition was grossly intact. Id.  Dr. Reed's assessment was that Lovell suffered from depression, not otherwise specified, and "[ rule-out] panic [disorder].[14] Id.  Dr. Reed prescribed the antidepressant drug Zoloft.[15]  Id.

On June 13, 2009, Lovell visited the emergency department at the Williamsport

---

[14]The diagnosis was "R/O panic DO."  The "rule-out" diagnosis is used inconsistently by different physicians and psychologists and the context in which the "rule-out" diagnosis is made has to be closely scrutinized.  The "rule-out" diagnosis can have two different meanings.  It can mean that the particular condition is in fact ruled out, i.e., the patient is not suffering from the condition, but it also can mean that further information is needed to evaluate whether the patient is in fact suffering from the condition. In the present case it is not clear how Dr. Reed was using the rule-out diagnosis but we assume for purposes of this decision that Dr. Reed was of the opinion that further evaluation was necessary. .
Dr. Reed initially evaluated Lovell on April 30, 2009. Tr. 226-228.  On that date Dr. Reed's diagnosis was the same as on June 9, 2009, and he gave Lovell a current Global Assessment of Functioning (GAF) score of 60 and a "highest in the past year" of 65.  The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

[15]Zoloft, Drugs.com, http://www.drugs.com/zoloft.html (Last accessed August 8, 2013).

Hospital complaining of right flank pain which at the time of the visit was mild in severity.[16] Tr. 513. A functional assessment of Lovell on arriving at the emergency department revealed that Lovell was independent with respect to activities of daily living.  Tr. 515.  When an attending physician reviewed Lovell's systems,[17] Lovell made no constitutional, gastrointestinal, cardiovascular, respiratory, musculoskeletal, skin, lymphatic, eyes, ears, nose, throat, neurological or psychiatric complaints. Id.  After conducting a physical examination and several diagnostic tests, it was concluded that Lovell suffered from an acute urinary tract infection. Tr. 514.  Lovell was prescribed the drugs Levaquin, an antibiotic,  and Pyridium, a pain medication, and upon being discharged advised to follow-up with her family physician if the condition did not improve. Tr. 519-520.

On July 12, 2009, Lovell visited the emergency department at the Williamsport Hospital complaining of shortness of breath (dyspnea) of moderate severity and exacerbated by deep breaths. Tr. 499-506.  Associated symptoms included dizziness, lightheadedness, tingling in hands and face, and anxiety. Tr. 499.  A review of Lovell's systems revealed that she had no other complaints. Id.  After performing a physical examination, the results of which were essentially normal, the assessment was that Lovell suffered from shortness of breath and anxiety/hyperventillation. Tr. 500.  Lovell was prescribed the drug Ativan

---

[16]Emergency Department records are sometimes difficult to decipher especially when handwritten.  In this case when a positive finding was observed the medical personnel at the Williamsport Hospital circled or wrote in the finding, e.g., right flank pain and mild for severity was circled, and when a negative finding was made there was merely a check mark or line through the item.

[17]"The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed August 8, 2013).

(lorazepam)[18] and discharged from the hospital with instructions to follow-up with her family physician if she did not improve. Tr. 506.

On August 12, 2009, Lovell had an appointment with Mary J. de Leon, M.D., an endocrinologist, in Williamsport, regarding her thyroid condition. Tr. 338-341. In the report of this appointment Dr. Leon stated that Lovell had a thyroid scan which revealed "a mild to moderate enlargement of the gland with a mildly elevated 24-hour iodine uptake" and that Lovell "was recently seen at the ER for panic attacks and tremors. She was given Lorazepam [Ativan] & she has not had any panic attacks since then." Tr. 338. When Dr. Leon reviewed Lovell's systems, Lovell denied fatigue, dysphagia (difficulty in swallowing), hoarseness, shortness of breath, chest pain, irregular heartbeat/palpitations, decreased appetite, cold intolerance and tremor and, insomnia. Tr. 339-340. Lovell noted an occasional cough, constipation/diarrhea, heat intolerance, depression, headache, mood swings, hair loss and occasional muscle cramps. Id. The results of a physical examination were essentially normal. Tr. 340. The only less than normal item was a "palpable" thyroid gland "but normal-sized." Id. It was also noted that Lovell had a normal affect under the psychiatric portion of the report. Dr. Leon's assessment was that the thyroid scan was "indicative of autoimmune thyroid disease" but that "[n]o treatment is necessary as long as her thyroid function remains normal." Tr. 340-341.

On August 19, 2009, Lovell visited the emergency department of the Williamsport Hospital complaining of dysuria (painful urination) which started on August 18th and was of moderate severity. Tr. 485. An initial functional assessment performed at the

---

[18]Ativan is a drug used to treat anxiety disorders. Ativan, Drugs.com, http://www.drugs.com/ativan.html (Last accessed August 8, 2013).

hospital revealed that Lovell was independent with respect to activities of daily living. Tr. 487. The dysuria was accompanied by burning pain and pressure in the pelvic area. Tr. 485. Lovell had positive frequent urination. Id. When the attending physician reviewed Lovell's systems, Lovell had no other complaints. Id. The results of a physical examination were essentially normal, including a normal back and non-tender extremities with normal range of motion and no edema. Tr. 486. With respect to psychiatric symptoms it was noted that Lovell had a normal mood and affect. Id. After performing the physical examination and some diagnostic tests, the clinical impression was that Lovell suffered from an acute urinary tract infection. Id. Lovell was prescribed the antibiotic Cipro and the pain medication Pyridium, and discharged from the hospital with instructions to follow-up with her family physician if her condition did not improve. Tr. 488-489 and 495.. At the time of Lovell's departure she was suffering "no distress" and she left the hospital ambulatory, walking. Tr. 488 and 494.

On September 15, 2009, Lovell had an appointment with nurse Peterman regarding her depression. Tr. 334-337. It was noted in the report of that appointment that Lovell was receiving "counseling through Diakon" and being "[f]ollowed by Dr. Reed[.]" Tr. 334. Lovell told nurse Peterman that the counseling was helping. Id. At the appointment Lovell also complained of "tunnel vision in her [right] eye for the last hour or so" and nausea and lightheadedness. Id. Lovell denied suffering from a headache.[19] Id. When nurse Peterman reviewed Lovell's systems, Lovell denied cough, shortness of breath (dyspnea),

---

[19]Lovell made inconsistent statement regarding whether she suffered from a headache. She told the registered nurse who initially interviewed her that she did not have a headache but then apparently told nurse Peterman that she had a headache. Tr. 335.

15

wheezing, chest pain, and irregular heartbeat or palpitations. Tr. 335.   Lovell also complained of recent nasal congestion and facial pressure over the right maxillary area. Id. Other than revealing a nasal problem, the physical examination did not reveal any abnormalities. Tr. 335-336.   Lovell had a normal level of consciousness; she was alert and oriented to person, place and time; her intellect was grossly intact; her memory was intact; she had no sensory loss or motor weakness; her balance, gait and coordination were intact; and her deep tendon reflexes were preserved and symmetric. Tr. 336. The nasal problem was described as "mild hypertrophy" of the right and left turbinates which are bony structures on the sides of the inner nose. Tr. 335.   Nurse Peterman's assessment was that Lovell suffered from depression, a migraine and rhinorrhea, a "runny nose" often associated with allergies or the common cold. Tr. 336.   Nurse Peterman ordered a sinus x-ray which was performed on September 23, 2009, and revealed "[n]o pathologic abnormality of the paranasal sinuses[.]". Tr. 336 and 427.

On October 12, 2009, Lovell had an appointment with nurse Peterman regarding her depression. Tr. 330-333.  When nurse Peterman reviewed Lovell's systems, Lovell did not report any "psychiatric symptoms or difficulty sleeping." Tr. 331.  Lovell told nurse Peterman that she was "doing well." Id.   Nurse Peterman reported that Lovell's affect was normal; she was negative for anhedonia;[20] she was not agitated; she had no suicidal ideations; and she had positive eye contact and "some smiling." Id.  Nurse Peterman observed that Lovell's right sinuses were tender, the right turbinate was moderately hypertrophic and her oropharynx was mildly cobblestoned. Id.  Nurse Peterman's clinical

---

[20]Anhedonia is defined as "total loss of feeling of pleasure in acts that normally give pleasure." Dorland's Illustrated Medical Dictionary, 91 (32nd Ed. 2012).

assessment was that Lovell suffered from depression and an upper respiratory infection. Tr. 332. Nurse Peterman gave Lovell some Claritan D. Id. Lovell had a follow-up appointment with Nurse Peterman on October 22, 2009, at which nurse Peterman's clinical assessment was that Lovell "present[ed] with a sore throat.". Tr. 327-329. On October 25, 2009, Lovell was examined and treated at the emergency department of the Williamsport Hospital for bronchitis and a viral syndrome. Tr. 481. Lovell was prescribed medications and discharged the same day. Tr. 478. Lovell departed the hospital ambulatory, walking. Id. A functional assessment performed at the hospital revealed that Lovell was independent with respect to activities of daily living. Tr. 477. When Lovell's systems were reviewed, her only complaints related to the upper respiratory system. Tr. 480.

On November 20, 2009, Lovell had an appointment with Leonard Weber, a physician's assistant, at Community Health Center, Williamsport. Tr. 324-326. The only complaints raised at that appointment related to constipation. Id. The results of a physical examination were essentially normal. Tr. 325.

On November 22, 2009, Diakon Family Life Services updated Lovell's treatment plan. Tr. 247-248. The updated treatment plan reveals that Lovell's Axis I diagnosis was depressive disorder, not otherwise specified (Code 311) and her initial GAF score was 60 (on April 30, 2009, by Dr. Reed) and her GAF score at the time of review was 62, representing mild symptoms. Tr. 248.

On December 4, 2009, Lovell had an appointment with Navin Barot, M.D., in Williamsport, regarding abdominal pain and diarrhea. Tr. 384-386. The report of this appointment by Dr. Barot reveals that Lovell quit smoking in or about December, 2007. Tr. 384. When Dr. Barot reviewed Lovell's systems, Lovell denied dysuria, urinary frequency,

joint pain, arthritis, myalgia, weakness, seizures, tremors, speech difficulty, muscle weakness and depression. Tr. 384-385. The results of a physical examination were essentially normal, including Lovell had no joint swelling; her range of motion of the extremities was normal; her gait was normal; and she had no sensory or motor deficits. Tr. 385. Dr. Barot further stated that Lovell had a normal mental status. Id. Dr. Barot's assessment was that Lovell was suffering from irritable bowel syndrome and scheduled a colonoscopy. Tr. 386. He further prescribed some medications and advised her to stop eating dairy products, wheat and eggs for 2 weeks. Id.

On December 9, 10 and 11, 2009, Lovell was examined and treated at the emergency department of the Williamsport Hospital for a dental abscess and cellulitis of the right face. Tr. 438-469. Lovell was treated with antibiotics. Id. The records of this treatment is notable only with respect to what the review of systems and physical examinations revealed. With respect to the review of systems on each day Lovell had no complaints other than with respect to the dental abscess/cellulitis. Tr. 446, 455 and 467. Physical examinations on December 9 and 10, 2009, did not reveal any abnormal findings other than with respect to the dental abscess/cellulitis. Tr. 467-468. On December 9th[th] Lovell was oriented to person, place and time; she had a normal mood and affect; she had no respiratory distress; she had a normal inspection of the ears, nose, mouth (other than the dental problem) and throat; and she had no motor or sensory deficits. Id. On December 10th[th] Lovell was in no acute distress and no abnormal findings were noted other than with respect to the abscess/cellulitis. Tr. 455. A physical examination on December 11, 2009, was essentially normal, including Lovell had a normal inspection of the neck and back. Tr. 446. Lovell's neck and back were non-tender and she had painless range of motion. Id. Lovell

18

also had no respiratory distress, her chest was non-tender and she had normal breath sounds. Id.

As noted earlier in this memorandum, Lovell had a long history of smoking cigarettes. The medical records reveal that Lovell sought treatment for the condition of her lungs from Kevin W. Kist, D.O., starting in May, 2008. Tr. 256-257. On December 28, 2009, Lovell had the third appointment with Dr. Kist. Tr. 250. A chest x-ray on December 28th revealed "no acute disease" and a stable appearance. Tr. 250 and 426. Spirometry tests demonstrated no obstruction, no restriction and normal diffusion.[21] Tr. 250. Lovell's blood oxygen level was 99% on room air at rest. Id. Lovell's peak flow (a measure of a person's speed of expiration) was 360 and Dr. Lovell noted that the result was better than a reading of 230 obtain in 2003. Id. Dr. Kist's clinical impression was that Lovell was suffering, inter alia, from bullous emphysema and a prior history of tobacco abuse. Id. The plan noted by Dr. Kist was to "recheck CT of the chest in six months" and have Lovell "utilize Proventil [albuterol] on [an as needed] basis."[22] Id. Dr. Kist noted that Lovell "has not required this medication." Id.

On January 8, 2010, Lovell had an appointment with Christina Cables, a certified registered nurse practitioner, at the Community Health Center, regarding a sore throat. Tr. 321-323. The clinical assessment was that Lovell suffered from a sore throat (acute pharyngitis). Tr. 322. On March 9, 2010, Lovell had a follow-up appointment with

---

[21]Spirometry is a lung function test which measures the amount or volume and speed or flow of air that can be inhaled and exhaled.

[22]Proventil is used to treat brochospasm in people with reversible obstructive airway disease.

nurse Peterman at the Community Health Center regarding her constipation. Tr. 318-320. Lovell told nurse Peterman "that her constipation [was] better." Tr. 318. At this appointment Lovell's "[l]ungs [were] clear to auscultation." Tr. 319. Lovell was advised to increase her activity and perform exercises "she can tolerate." Id.

On April 26, 2010, Joseph J. Kowalski, Ph.D., a psychologist, reviewed Lovell's medical records on behalf of the Bureau of Disability Determination. Tr. 596-608. Dr. Kowalski concluded that Lovell suffered from depressive disorder, not otherwise specified but that it was a non-severe mental impairment. Id. Dr. Kowalski found that Lovell had no limitations with respect to activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace. Tr. 606. He further found that she had no episodes of decompensation of extended duration. Id.

On April 30, 2010, Vinaykant N. Shah, M.D., reviewed Lovell's medical records on behalf of the Bureau of Disability Determination and concluded that Lovell retained the physical ability to perform the full range of medium work. Tr. 614-619.

In May and June, 2010, Lovell was treated at the Community Health Center for a urinary tract infection and constipation, respectively. Tr. 675-679. The report of the examination on June 10th notes that Lovell exhibited "[n]o unusual anxiety or evidence of depression." Tr. 675. That report further notes that Lovell had started Yoga exercises the day before. Id.

A CT scan of Lovell's thorax on June 21, 2010, revealed "[s]table bilateral emphysematous changes most pronounced in the upper lobes, right greater than left." Tr. 693. On June 28, 2010, Lovell had an appointment with Dr. Kist. Tr. 692. Dr. Kist reported that Lovell "overall continues to do well" and that the physical examination findings were

unchanged from the prior exam in December, 2009, except with respect to Lovell's weight. Id.   Dr. Kist's clinical impression was essentially the same as his clinical impression in December, 2009. Id.

At an appointment on August 17, 2010, with nurse Peterman, Lovell complained of back pain. Tr. 672-674.  A physical examination revealed tenderness in the spine, paravertebral muscle spasm and lumbosacral tenderness. Tr. 672.  Lovell had "increased discomfort with [right] lateral bending." Id.  However, "elevated leg test" was negative; she had no cyanosis; she was able to walk on her heels and toes, and her lower extremity deep tendon reflexes were normal.[23]  Tr. 672-673.   The clinical impression was "back pain" and Lovell was referred to physical therapy. Tr. 673.

On August 21, 2010, Lovell was treated at the emergency department of the Williamsport Hospital for a urinary tract infection. Tr. 623-636.  Lovell was prescribed an antibiotic and discharged with instruction to follow-up with her family physician if the condition did not improve. Id.

On August 25, 2010, Lovell had an initial physical therapy evaluation for her low back pain at the Williamsport Hospital. Tr. 637-638.  At that time, it was recommended that Lovell attend therapy three times per week for two to four weeks. Id.  However, Lovell's

---

[23]The heel walk test requires the patient to walk on his or her heels. The inability to do so suggests L4-L5 nerve root irritation. The toe walk test requires the patient to walk on his or her toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime. com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed August 12, 2013).  The fact that Lovell was able to walk on heels and toes suggest that she did not have nerve root irritation.  Also, normal deep tendon reflexes suggests the absence of nerve root damage.  Neurological Exams, Sensory Nerves and Deep Tendon Reflexes, Spine Universe, http://www.spineuniverse.com/exams-tests/neurological-exams-sensory-nerves-deep-tendon-reflexes (Last accessed August 12, 2013).

therapy was discontinued in September, 2010, because she only attended three of her seven sessions and she was advised to continued her home exercise program. Tr. 639.

Lovell on October 4, 2010, sought treatment at the Community Health Center for muscle spasms in her legs. Tr. 669-671. At that time Lovell indicated that she experienced bilateral leg spasm that "usually last minutes" and the "most recent episode" was "last [week]." Id. Lovell indicated that prior to this recent episode, she had not experienced spasms for six months. Id. The results of a physical examination performed by nurse Peterman were essentially normal. Tr. 670. Nurse Peterman referred Lovell to a neurologist and for diagnostic tests, including electromyography (EMG) and electroencephalography (EEG). Id.

An EMG was performed on October 20, 2010, by Edwin Roman, M.D. Tr. 640-641. The test was not completed because Lovell allegedly began to have muscle spasms of the right leg and stated that she was in too much pain to continue. Id. Dr. Roman in the report of the study noted the following: "This is a limited study because of the lack of right lower extremity and bilateral paraspinal EMG testing. However, on the basis of the nerve conduction studies and Needle EMG of the right lower extremity, there is no evidence of peroneal or tibial compression neuropathies or peripheral polyneuropathy affecting the lower extremities. There appears to be no evidence of a proximal process in that there are no denervation potentials on any of her leg muscles and the F-waves were all normal. Clinical correlation is recommended." Tr. 641.

Two days later, Lovell returned to the Community Health Center complaining of back pain. Tr. 666-668. Lovell was examined by nurse Peterman. Id. A physical

examination revealed tenderness of right paraspinal muscles, but no paravertebral spasm. Id. Lovell had calf tenderness and tenderness to palpation of the thighs. Id. She had mild weakness against resistance with pushing/pulling of the lower extremities and some hyper reflexes (patella and achilles). Tr. 667. Nurse Peterman prescribed a low dose of Flexeril for Lovell's muscle spasms. Id.

AN EEG was performed on October 26, 2010, at the Williamsport Hospital. Tr. 696. The results of the EEG were normal. Id. There were "[n]o focal, diffuse or generalized abnormalities[.]" Id.

An MRI of Lovell's lumbar spine performed on October 27, 2010, revealed "[m]inimal scoliosis" and "[n]o disc herniation, canal or foraminal stenosis[.]" Tr. 685.

On November 8, 2010, Lovell had an appointment regarding her muscle spasm and headaches with Jacob Gordon, M.D., a neurologist with Susquehanna Health Medical Group, in Williamsport. Tr. 697-700. When Dr. Gordon reviewed Lovell's systems, Lovell denied fatigue, fever, night sweats, eye discharge, vision loss, ear drainage, hearing loss, nasal drainage, cough, shortness of breath, wheezing, chest pain, claudication (limping), irregular heartbeat/palpitations, abdominal pain, constipation, diarrhea, vomiting, dysuria, cold intolerance, heat intolerance, gait disturbance, rash, bleeding or bruising, environmental and food allergies, and psychiatric symptoms. Tr. 698. The only items complained of were back pain and myalgias (muscle pain). Id. A physical examination revealed no abnormalities. Id. Lovell was in no apparent distress and her gait was intact and symmetric. Id. Dr. Gordon stated that the "neurological examination today came out fine: we found nothing dangerous." Tr. 700. Blood tests revealed that Lovell had low levels of vitamin B12

and prescribed a series of  B12 injections. Id.  A follow-up appointment was scheduled in January, 2011. Id.   Lovell had B12 injections administered at the Community Health Center by nurse Peterman on November 12, 16, 19, 23, and 29, and  December 6, 10, 13, 17, and 27, 2010. Tr. 644-665.

On January 7, 2011, Lovell had a follow-up appointment with a neurologist at the Susquehanna Health Medical Group. Tr. 701-703.  At that appointment Lovell reported that her headaches and muscle spasms were less frequent. Tr. 701.  She also reported that the B12 injections had given her more energy. Id.  When the neurologist reviewed Lovell's systems, Lovell denied eye discharge, vision loss, ear drainage, hearing loss, nasal drainage, cough, shortness of breath, wheezing, chest pain, irregular heartbeat/palpitations, abdominal pain, constipation, diarrhea, vomiting, dysuria, cold intolerance, heat intolerance, gait  disturbance,  rash,  bone/joint  symptoms,  weakness,  bleeding  and  bruising, environmental and food allergies, and psychiatric symptoms. Tr. 701-702.  The results of a physical examination were essentially normal, including normal strength and intact recent and remote memory, sensation, gait, coordination and balance. Tr. 702.  Her deep tendon reflexes were preserved and symmetric. Id.  There were trigger points noted in Lovell's shoulder and cervical areas. Id.   The clinical assessment was migraines, muscle spasms and fibromyalgia. Id.  The neurologist prescribed the drugs Lyrica and Flexeril  and ordered blood tests. Id.  He further continued the B12 injections[24]. Id.

On March 14, 2011, Lovell had an appointment with Dr. Kist regarding her emphysema. Tr. 690-691.  A physical examination performed on that date was essentially

---

[24]Oddly Lovell testified at the administrative hearing that the injections were never performed because they were not helpful. Tr. 56 and 62.

unchanged from her June, 2010, examination, with the exception of mild chest discomfort with cough and minimally course breath sounds. Tr. 690. Dr. Kist noted that when he initially examined Lovell on that date she had no cough but after the office visit when he went back into the room Lovell did have a nonproductive cough. Id. Dr. Kist's impression was unchanged from that of June, 2010. Id.

On March 21, 2011, nurse Peterman completed a physical capacity evaluation form at the request of Lovell's attorney. Tr. 694. In the form nurse Peterman indicated Lovell was unable to work at this time and that Lovell could lift 10-20 pounds, stand/walk 2 to 4 hours in an 8-hour workday, sit 4 to 6 hours in an 8-hour workday and drive 4-6 hours. Id. According to nurse Peterman Lovell could not grasp or push/pull with her hands and had to avoid carrying more than 30 pounds and avoid squatting, stooping, pushing, pulling, overhead reaching, twisting, and kneeling if in pain. Id. Nurse Peterman further indicated that Lovell required unscheduled breaks during an 8-hour workday and would be likely absent because of medical conditions in excess of 2 days per month. Id. Nurse Peterman did not indicate that the limitations had lasted or were expected to last for a continuous period of 12 months, only that on March 21, 2011, Lovell was unable to work and that the limitations would last until Lovell's appointment with a rheumatologist in May, 2011. Id.

On April 11, 2011, Lovell had an appointment with Keith Schenberger, M.D., a rheumatologist, located in Williamsport. Tr. 705-708. Dr. Schenberger's report of this appointment sets forth no physical examination findings other than Lovell's vital signs: blood pressure 98/68, pulse 72, respiration 16, height 5 feet, 5 inches, and weight 147 pounds. Tr. 707. Dr. Schenberger's impression was merely as follows: "(1) cramp, aching and [a

positive] R[heumatoid] F[actor]." Tr. 708. He recommended a course of Prednisone, Flexeril, and additional blood tests. Id.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Lovell had not engaged in substantial gainful activity since May 12, 2009, the alleged disability onset date. Tr. 13.

At step two, the administrative law judge found that Lovell suffers from the following severe impairments: "Bullous Emphysema and Fibromyalgia." Id. The administrative law judge found that all of Lovell's other impairments were either non-severe or not medically determinable. Notably, the ALJ found that Lovell's alleged low back problems and mental impairments were non-severe and that her muscle spasms were not medically determinable because of the sporadic nature of the spasms and lack of objective medical diagnostic findings. Tr. 15. In finding that the alleged low back problems and mental conditions were non-severe the ALJ relied on the assessments of the state agency psychologist, Dr. Kowalski, and state agency physician, Dr. Shah. Tr. 18 and 22.

At step three of the sequential evaluation process the administrative law judge found that Lovell's impairments did not individually or in combination meet or equal a listed impairment. Tr. 18.

In addressing step four of the sequential evaluation process in her decision, the administrative law judge found that Lovell could not perform her past relevant medium work but that she could perform a limited range of unskilled, light work. Tr. 18, 23 and 69-70. Specifically, the administrative law judge found that Lovell could perform light work

> except she would need to avoid moderate exposure to temperature extremes of cold and heat, wetness, humidity, fumes, odors, gases, dust and poor ventilation; occasional bending, stooping, crouching, crawling, squatting, kneeling, and climbing, but never on ladders, ropes or scaffolds, and no pushing or pulling with the lower extremity.

Tr. 18. In arriving at this residual functional capacity the administrative law judge found that Lovell's statements about her physical and mental functional limitations were not credible. Tr. 19. In additional the administrative law judge placed substantial weight on the opinions of the state agency psychologist and physician. [25]

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Lovell had the ability to perform jobs such as a packer, counter/rental clerk and sorter,[26] and that there were a significant number of such jobs in the state and national economies. Tr. 23 and 69-70.

The administrative record in this case is 708 pages in length and we have thoroughly reviewed that record. The administrative law judge did an adequate job of reviewing Lovell's medical history and vocational background in her decision. Tr. 11-24. Furthermore, the brief submitted by the Commissioner also adequately reviews the medical and vocational evidence in this case. Doc. 12, Brief of Defendant.

Lovell argues that the administrative law judge (1) erred by finding that Lovell's

---

[25]The ALJ relied on the opinion of Dr. Shah but gave Lovell the benefit of the doubt and reduced her functional ability to the light exertional level.

[26]All of these position were identified by the vocational expert as unskilled, light positions. Tr. 69-70. However, the vocational expert also identified a significant number of packer and sorter positions at the unskilled, sedentary level which Lovell could perform. Tr. 70.

leg spasm were not a medically determinable impairment, and (2) erred by finding that Lovell's mental disorder and back pain were not serious impairments. We find no merit in Lovell's arguments.

To be disabling, an impairment must be "medically determinable." 20 C.F.R. § 404.1505(a). A 'medically determinable" impairment is one which is supported by medical evidence consisting of clinical signs and laboratory findings. 20 C.F.R. §§ 404.1508 and 404.1512 (b) and (c); Social Security Rule (SSR) 96-4p. Clinical "[s]igns are anatomical, physiological, or psychological abnormalities which can be observed, apart from [Lovell's] statement of symptoms." 20 C.F.R. § 404.1528(b). "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." 20 C.F.R. § 404.1528(c). A statement of symptoms, without medical evidence, cannot establish the existence of a medically determinable impairment. 20 C.F.R. § 404.1528(b); SSR 96-4p. In this case, there is simply no medical evidence that shows the existence of a "medically determinable impairment" of leg spasm to support Lovell's allegations that she experienced disabling symptoms from this impairment, or even symptoms that would have prevented her from performing the minimal physical demands of the jobs identified by the vocational expert.

The ALJ explained why she found the leg spasm/cramping to be a non-medically determinable impairment. She pointed to the sporadic nature of the spasms and the fact that specialists were unable to diagnose any medical condition causing them. She also noted that diagnostic tests to evaluate the alleged spasm, including an EEG, EMG and MRI were negative. Apart from one examination where muscle spasms were observed by

Dr. Ramon after the needle EMG, there is no independent evidence that Lovell had spasms. Dr. Ramon's one-time observation does not undermine the ALJ's determination. Dr. Ramon did not provide any support for Lovell's statement regarding the frequency of these spasm, or the alleged lasting residual pain and cramping in the aftermath of the alleged spasms. In fact on November 8, 2010, Dr. Gordon, a neurologist, reported that Lovell was in no apparent distress and her gait was intact and symmetric. Tr. 698. Dr. Ramon did not identify any work restrictions related to the alleged spasms or that they would prevent Lovell from engaging in light or sedentary work. Also, the ALJ in her decision noted that the limitations she provided for in the residual functional capacity assessment would accommodate Lovell's complaints relating to muscle cramping. Tr. 15.

No treating physician, psychiatrist or psychologist has indicated that Lovell suffered from physical or mental functional limitations that would preclude her from engaging in the limited range of work set by the administrative law judge in her decision for the requisite statutory 12 month period.[27] The functional assessment provided by nurse Peterman is for a period less than the 12 month period. In contrast a state agency psychologist has opined that Lovell's mental conditions were non-severe and a state agency physician has opined that Lovell had the physical ability to engage in medium work. It was clearly appropriate for the administrative law judge to rely on those assessments. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found

---

[27]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


s/A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge


Dated: August 12, 2013